UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Christopher W. Smith,<br><br>*Plaintiff,*<br><br>v.<br><br>Ally Financial, Inc.,<br><br>*Defendant.* | Civil Action No.: _____<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Christopher Smith brings this complaint and alleges as follows:

## NATURE OF THE ACTION

1. This is a lawsuit to remedy unlawful sexual and racial discrimination in the employment context.

2. Ally Financial, Inc., through the guise of "Diversity, Equity, and Inclusion"—or "DE&I" as they call it—is systematically engaging in intentional discrimination based on the protected characteristics of race and sex.

3. As part of its DE&I program, Ally posts demographic statistics regarding its employees on its website and professes a desire to "improve" those statistics—*i.e.*, by increasing the comparative fractions of women and racial minorities in its workforce vis-à-vis men and non-minorities.

4. In this case, Ally engaged in sex- and race-based employment discrimination against Christopher Smith, a veteran who spent over two decades performing intelligence and counterterrorism work for the U.S. Armed Forces, including in Iraq

1

and Afghanistan. When Mr. Smith applied for a position as Physical Security Intelligence Manager with Ally, Ally passed over Mr. Smith—who had more than 20 years of relevant experience—for an individual who had less than one-fourth of that experience but fit Ally's preferred "gender identity" of female.

5. After Mr. Smith accepted a lower-paying and lower-prestige "analyst" position with Ally, the discrimination continued. Mr. Smith's boss, who was fixated on white supremacy and "anti-woke" groups as the biggest threats to Ally, put substantial obstacles in the way of Mr. Smith's ability to perform his job duties and cut off any potential for advancement, in part because of Mr. Smith's status as a white male. This discrimination led to Mr. Smith's constructive discharge from his position as an intelligence analyst for Ally.

6. Ally's conduct violated the protections against race-based and sex-based discrimination in the Civil Rights Act of 1866 and Title VII of the Civil Rights Act of 1964. Mr. Smith brings this action to vindicate his rights under these statutes and obtain legal and equitable redress for Ally's unlawful discrimination.

## THE PARTIES

7. The Plaintiff, Christopher Smith, is a citizen and resident of the State of North Carolina. He resides in Trinity, North Carolina. He is a Caucasian male.

8. Defendant Ally Financial, Inc. is a Delaware Corporation with its principal place of business in Detroit, Michigan.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. §1331

2

because the federal claims arise under the Constitution and laws of the United States.

10. This Court has personal jurisdiction over Defendant Ally Financial because Ally does substantial business in North Carolina, and Mr. Smith's claims relate to Ally's activities in North Carolina. Specifically, Ally employs more than 2,000 individuals in its "Corporate Center" in Charlotte, and the positions Mr. Smith applied for and held with Ally were based in Charlotte.

11. Venue is proper in this District because a substantial part of the events or omissions giving rise to Mr. Smith's claims occurred in this district. 28 U.S.C. §1391(b).

## FACTS

### A. Ally's Practice of Discrimination.

12. A company's commitment to remaking the demographics of a workforce as part of a diversity, equity, and inclusion program supports an inference of employment discrimination. *Duvall v. Novant Health, Inc.*, 95 F.4th 778, 788-89 (4th Cir. 2024); *see id.* at 791 (evidence of "a substantial D&I initiative that called for remaking [defendant's] workforce to reflect a different racial and gender makeup" supported employment discrimination claim).

13. Ally, as a matter of both company culture and official company policy, attempts to modify employee demographics in a discriminatory matter. Ally has "a deliberate focus on DE&I with an intentional emphasis on inclusion, which expands beyond traditional definitions of diversity." Form 10-K at 18 (Ex. A), Ally Financial

3

Inc. (2023), perma.cc/F8RS-HXRX. Ally employs a Chief Diversity Officer as well as "16 full-time employees designated to advance DE&I within ally." *Id.* Ally's leadership also includes a "DE&I Council" that "provides executive leadership on DE&I and promotes belonging at Ally and in our communities." *Id.*

14. This commitment extends to implicit demographic targets that impact hiring and advancement. For example, Ally's DEI webpage professes a desire to "improve" the company's "employee demographics" to create "a collective environment of different voices and perspectives." *See Diversity, Equity, & Inclusion* (*Ally DE&I page*), Ally Financial Inc., perma.cc/7KH6-6GBG ("We've come a long way, but, as our employee demographics show, we have room to improve.").

15. Through its DE&I programs and otherwise, Ally closely monitors the racial and gender breakdown of its hiring, advancement, and retention of employees. Ally "take[s] deliberate steps to weave DE&I through all [its] human capital efforts: from pipelining candidates, onboarding, all the way through the employee lifecycle." *Id.*

16. Ally also incentivizes its leadership—through performance metrics and reviews—to consider race and gender in hiring and promotion. "[F]or all executive leaders, annual performance objectives and reviews include a specific focus on representation and diversity trends within the workforce." *Id.* at 19.

17. Ally tracks statistics on the demographics of its workforce and posts those statistics on its DE&I website. *See* Ally DE&I page, *supra* (listing the percentage of women or people of color (a) on Ally's Board of Directors; (b) on Ally's executive

council team; (c) promoted or advanced in the last year; and (d) retained as employees year-over-year). Ally also professes a desire to "improve" these statistics, which implies that it has an as-yet-unmet quota for women and racial minorities in its workforce and leadership positions. *Id.*

18. Ally strives to balance the number of men and women in its workforce and in managerial roles. It recently boasted that "[a]s of December 31, 2023, our gender representation is approximately 51% men and 49% women. We *increased* or maintained representation of women and people of color in our manager and above roles, and *redesigned* programs to create more opportunities for individuals new to their roles in the company." Ally 2023 Form 10-K, *supra*, at 19. (emphasis added).

### B. Mr. Smith's Qualifications and Application Process

19. In 2023, Ally posted three new positions in its newly created Physical Security and Threat Division. The hiring manager for these positions was Bruce Bellamy, the Director of Physical Security Intelligence & Threat Preparedness at Ally.

20. The three positions, all of which were listed as "Mid-Senior level," were:

   a. Manager, Physical Security Intelligence: five or more years of experience required and a salary range of $90,000 to $150,000.

   b. Senior Analyst, Physical Security Threat Preparedness: three or more years of experience required and a salary range of $70,000 to $90,000.

   c. Analyst, Physical Security Intelligence: no minimum experience requirement and a beginning salary range of $55,000 to $80,000.

5

21. Mr. Smith applied for all three positions on the first day they were posted on LinkedIn.

22. Mr. Smith was well-qualified for all three positions. His qualifications included more than 20 years of relevant experience in the intelligence profession. *See* Ex. B (Mr. Smith's resume).

23. Mr. Smith's background includes 8 years in the Marine Corps, 14 years as a leader in Army intelligence, and 2 years as a Security Forces Marine at the White House Communications Agency, during which time he protected presidential communications systems in foreign countries. During this time, Mr. Smith also developed substantial expertise in, among other disciplines, executive security, risk assessment, intelligence planning, intelligence investigations, intelligence surveillance and reconnaissance, predictive analysis, video security surveillance, and security management.

24. Mr. Smith has performed intelligence training, instruction, and operations since 2001, including participating in counterterrorism operations in Iraq, Afghanistan, Djibouti, Nigeria, Singapore, and North America. Mr. Smith's intelligence activities in the Armed Forces earned him the Afghanistan Campaign Medal, the NATO Medal, the Army Commendation Medal with Combat distinction, the Army Achievement Medal with Combat distinction, and the Iraq Campaign Medal & Combat Action ribbon.

25. Mr. Smith has been a Threat Awareness Instructor since 2015 and has trained hundreds of soldiers on how to spot, identify, and report insider threats. He

6

has also been a communications security manager, physical security manager, and industrial security manager for several military units. And he has experience vetting vendors and employees using criminal and counterintelligence background checks.

26. Mr. Smith has been a senior leader in the intelligence profession since 2009, leading intelligence teams at the company, battalion, brigade, and joint forces levels. He and his teams have produced and delivered intelligence briefings to the Governor of North Carolina, the Chief of Staff of Intelligence for the State of North Carolina, and the North Carolina Joint Operations and Emergency Management Center, among others.

27. Mr. Smith has a Top Secret/Sensitive Compartmented Information (TS/SCI) security clearance and numerous intelligence certifications, including certified Intelligence Analyst from the Defense Intelligence Agency.

28. After applying for all three open positions, Mr. Smith reached out to Director Bellamy and offered to fill any of the three positions for a starting salary of $75,000 per year. This was an attempt to make himself more competitive for the manager position. He did so because he was excited about the opportunity to build a new department and have professional growth come as he did so.

29. Mr. Smith was objectively qualified for the manager position and objectively overqualified for the other positions.

30. Ally considered Mr. Smith for all three positions and interviewed him for the "Senior Analyst" and "Analyst" positions. Director Bellamy said that Mr. Smith did not have to be interviewed a third time to be fully considered for the

7

manager position because Mr. Smith had already been interviewed twice, and there was no other information Ally needed.

31. Director Bellamy even introduced Mr. Smith on his first day of work as the "only candidate that was considered for all three positions."

32. Mr. Smith was interviewed by a team that included Director Bellamy and three other individuals—Chris Michael, Michael Pendrak, and Cecil Brisbon. This hiring committee was the same for all three positions. The interviewers appreciated Mr. Smith's experience and qualifications and appeared to think he would be a good fit for an intelligence position at Ally. For example, Director Bellamy noted after Mr. Smith's interview for the Senior Analyst position that "Candidate's experience and knowledge is extremely impressive," he would be well suited "in an intelligence role," and "Candidate would be an asset to Ally." Apparently recognizing Mr. Smith's extensive experience, Director Bellamy also asked how Mr. Smith felt about "working under someone less experienced."

33. Ally offered Mr. Smith the Physical Security Intelligence Analyst position—the most junior and lowest-paying role of the three to which he had applied. Mr. Smith accepted the junior role with the understanding that he was evaluated and offered the role based on good-faith, honest, merit-based, and nondiscriminatory hiring practices. Mr. Smith took the most junior position expecting that the senior positions would be filled by people with more experience and qualifications than him.

34. Ally ultimately hired Rachel Stuckey, a white female with 15 years less experience, for the Physical Security Intelligence Manager role.

8

35. Before starting the Physical Security Intelligence Manager role at Ally, Ms. Stuckey had a total of 4 years and 5 months of full-time intelligence experience, all at Walmart. Ms. Stuckey spent 2 years and 5 months as a Program Manager for Associate Vetting at Walmart, followed by 2 years as a Senior Manager for Behavioral Threat Management.

36. Before her employment with Walmart, Ms. Stuckey spent 1 year and 3 months as a part-time Intel Analyst for the International Institute for Counter-Terrorism in Tel Aviv, Israel.

37. Ally has claimed that it hired Ms. Stuckey for the Physical Security Intelligence Manager role because of (1) her counterterrorism training in Israel; (2) her background in Behavioral Threat Assessment and Research; and (3) positions as a Senior Threat Manager and Security Risk Manager at Walmart. This purported explanation is not credible for many reasons, including because Mr. Smith's experience greatly exceeds Ms. Stuckey's in all three of these areas (counterterrorism training, threat assessment and management, and security management).

38. The more credible explanation is that Ally hired Ms. Stuckey, who was objectively less qualified for the role than Mr. Smith, because of her sex, for the manager role to advance Ally's DE&I objectives and targets.

39. On information and belief, if Ally's hiring team had not discriminated based on sex in keeping with Ally's DE&I framework and goals, it would have evaluated Mr. Smith's relevant education, background, and experience in the disciplines of physical security and intelligence to far surpass those of Ms. Stuckey.

9

40. Ally hired a black female named Clarissa Ninn to fill the Senior Analyst, Physical Security Threat Preparedness role.

41. Ally selected Ms. Ninn for the Senior Analyst role to satisfy their DE&I quota requirements. Ms. Ninn satisfied both race and sex quotas. Mr. Smith satisfied neither as a white male.

42. Ally hired Jeffrey Barrett, an African American male, for another Senior Analyst Role. Upon information and belief, Mr. Barrett had little to no intelligence experience prior to being hired at Ally.

43. Upon information and belief, Jeffrey Barrett was hired into the Senior Analyst role based on Ally's racially motivated hiring practices and DE&I considerations.

44. As a result of this discriminatory hiring, Mr. Smith received less compensation than he otherwise would have. Ally also harmed his reputation by relegating him to a position with less prestige and responsibilities—making it more difficult to find replacement employment.

**C.  Mr. Smith's Employment at Ally and Constructive Discharge**

45. Mr. Smith accepted the Physical Security Intelligence Analyst role on July 20, 2023, and began working for Ally on August 21, 2023.

46. Mr. Smith reported to Director Bellamy and Ms. Stuckey, once she began working for Ally on September 11, 2023.

47. Throughout Mr. Smith's employment, Director Bellamy fixated on DE&I issues. He believed that the biggest security threats facing Ally came from

white supremacists, "anti-DEI" groups, and "anti-woke" groups.

48. One of Director Bellamy's top priorities was promoting Ally's DE&I programs and monitoring threats due to perceived opposition to those programs. For example, after the owner of an anonymous X account posted that he was withdrawing his money from Ally because it was a "Woke" bank, Director Bellamy spent multiple days trying to identify the owner of the X account and match the individual to a bank account at Ally.

49. Director Bellamy and Ms. Stuckey isolated Mr. Smith from other Ally employees, refused to credit him for his work product, and imposed substantial obstacles on his ability to perform his job duties, harming his performance.

50. When Mr. Smith began working at Ally, Director Bellamy provided little guidance, instead telling Mr. Smith that he would "let him sit there and do what he does." Accordingly, in his initial weeks on the job, Mr. Smith focused on developing the basic intelligence functions he believed every corporation needed. The documents Mr. Smith produced included the following:

    a. an executive domestic travel brief;

    b. an executive foreign travel brief;

    c. an executive natural disaster brief;

    d. an economic conditions tracker;

    e. an environmental direct action threat group assessment;

    f. a method to detect, track, and mitigate direct action civil disobedience operations against banks; and

  g. a half-sheet travel guide on counterespionage best practices.

  51. When Mr. Smith sent these materials to Director Bellamy, he received no substantive feedback other than requests to include a white supremacy threat. For example, after Mr. Smith created a draft Executive Travel Security Brief for a Hispanic Businesswomen's Conference in Austin, Texas, Director Bellamy insisted that Mr. Smith add white supremacist disruption or violence as a threat even after Mr. Smith researched the threat and determined there was no evidence that such a threat was remotely likely.

  52. In short order, Ally and Director Bellamy began imposing obstacles that reduced Mr. Smith's prospects for advancement and made it difficult for him to perform his job duties. For example, Director Bellamy offered a company-paid online certification class to the other analysts, who were racial minorities. But, despite Mr. Smith's multiple requests, Director Bellamy did not allow him to attend the same training.

  53. Director Bellamy also instructed Mr. Smith to give any intelligence materials only to him (or, once Ms. Stuckey was hired, only to her), and used those materials without giving any attribution or credit to Mr. Smith.

  54. Director Bellamy also made it difficult for Mr. Smith to perform his day-to-day job duties. For example, he repeatedly declined to give Mr. Smith access to the team conference room despite Mr. Smith's requests. Ally provided Ms. Ninn and Ms. Stuckey with access during their first day on the job.

  55. Director Bellamy assigned Mr. Smith a parking spot a half mile away,

12

Case 3:24-cv-00529-MOC-DCK  Document 1  Filed 06/04/24  Page 12 of 20

while Ms. Ninn and Ms. Stuckey received parking next to Ally's offices. Despite Mr. Smith's request for a closer parking location due to a back disability and his longer commute, Director Bellamy did not change Mr. Smith's parking location.

56. Mr. Smith was required to come into the office five days a week and was given no flexibility to work from home, unlike Mr. Barrett—an African American male—who was given flexibility to work from home, despite having similar commute times from the office.

57. On information and belief, Ally's and Director Bellamy's differential and negative treatment of Mr. Smith was motivated by Mr. Smith's race and sex. Director Bellamy took particular umbrage at a white male questioning his views on the threat posed to Ally by white supremacy and "anti-woke" groups.

58. Recognizing that Director Bellamy and Ms. Stuckey had discriminatorily structured the intelligence team to limit his opportunities for recognition and advancement—and to unnecessarily increase the difficulty of his day-to-day work—Mr. Smith offered his two weeks' notice on September 18, 2023.

59. Mr. Smith explained these problems during his exit interviews with Ms. Stuckey and Ally's human resources team. One HR employee told Mr. Smith that the way he was treated was "not standard practice at Ally" and that she "would talk to Bruce [Bellamy] about this."

60. After leaving Ally, Mr. Smith sought replacement employment but was unable to find suitable opportunities.

61. Ally's relegation of Mr. Smith to a role that did not reflect his experience

and capabilities and his short tenure at the company had harmed Mr. Smith's reputation.

62. Mr. Smith eventually accepted a role with a new company in October 2023, where he still works today.

63. In his current role, Mr. Smith works only for equity in the start-up company and does not receive wages.

64. In his current role, his skills have been utilized and he has built an intelligence program and now serves as the Intelligence Director.

65. Not working for wages, however, has put severe financial and emotional stress on Mr. Smith. In addition to having to live off savings, he is unable to benefit from the 401(k) program he was enrolled in at Ally and has lost out on investment opportunities to fund his retirement.

66. The stress has also put extreme strain on his family relationships, which have suffered great harm as a result of these stressors.

67. The stress from Mr. Smith's discriminatory treatment by Ally and his later job search caused Mr. Smith to suffer substantial emotional distress.

68. Mr. Smith sought relief from the Equal Employment Opportunity Commission. He timely filed a Charge of Discrimination on December 13, 2023. The Commission issued a right-to-sue letter on April 22, 2024. (Ex. C).

# CLAIMS FOR RELIEF
## Count I
## Disparate Treatment in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

69. Plaintiff repeats and realleges each of the prior allegations.

70. Title VII makes it illegal for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).

71. Defendant Ally "fail[ed] or refuse[d] to hire" Plaintiff for the role of Physical Security Intelligence Manager because of his sex (male), instead hiring an objectively less qualified candidate because she fit Ally's preferred sex (female). *Id.* Defendant also "discriminate[d] against" Plaintiff "with respect to his compensation, terms, conditions, or privileges" of employment" by treating Plaintiff differently because of his sex and race. *See Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024); *Duvall*, 95 F.4th at 788-91.

72. Defendant Ally failed or refused to hire Plaintiff for the role of Senior Analyst because of his race (white) and sex (male), instead hiring less qualified candidates: one black male and one black female.

73. As a result of Defendant's discriminatory conduct, Plaintiff was forced to choose between accepting a lower paying and less prestigious position for which he was overqualified, or foregoing employment with Defendant altogether. And because

15

of Defendant's discrimination, Plaintiff was forced to endure worsened working conditions.

74. As a result of Defendant Ally's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, loss of professional and career development opportunities, and significant non-economic injuries, including humiliation, embarrassment, and loss of reputation.

## Count II
## Violation of the Civil Rights Act of 1866, 42 U.S.C. §1981

75. Plaintiff repeats and realleges each of the prior allegations.

76. Under 42 U.S.C. §1981(a), "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts … as is enjoyed by white citizens." Section 1981 "has a specific function: It protects the equal right of 'all persons' … 'to make and enforce contracts without respect to race.'" *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up).

77. Section 1981 covers private parties like Ally. The Act applies to governmental and "nongovernmental" actors, §1981(c), and provides a cause of action for public or private discrimination based on race. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). Section 1981 authorizes "both equitable and legal relief," including "damages." *Id.* at 460.

78. Section 1981 permits claims based on intentional discrimination of employment contracts. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 182 (1989) ("Of course, some overlap will remain between the two statutes: specifically, a refusal to enter into an employment contract on the basis of race. Such a claim would be

16

actionable under Title VII as a 'refus[al] to hire' based on race, 42 U.S.C. § 2000e–2(a), and under §1981 as an impairment of 'the same right ... to make ... contracts ... as ... white citizens,' 42 U.S.C. §1981.").

79. Moreover, an employer cannot "discriminate against some employees on the basis of race," like white men, "merely because he favorably treats other members" of that race, like white women. *Connecticut v. Teal*, 457 U.S. 440, 455 (1982). "So long as the plaintiff's [race] was one but-for cause" of his exclusion, "that is enough." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020); *accord Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 340-41 (2020).

80. But for the Plaintiff's race and sex he would have been hired into a higher position for higher wages.

81. Defendant Ally conspired and agreed to contract based on race, color, or national origin pursuant to its DE&I policies and 10-K statements. Specifically, Ally's corporate filings admit placing an emphasis on hiring based on sex and race, and when it came to filing a newly created division, they hired a female as the manager, two black individuals for "senior analyst" roles, and a white male, with the most experience, to the lowest position available.

82. As a result of Defendant Ally's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, loss of professional and career development opportunities, and significant non-economic injuries, including humiliation, embarrassment, and loss of reputation.

## Count III
## Constructive Discharge in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.

83. Plaintiff repeats and realleges each of the prior allegations.

84. An employer violates Title VII when it creates "'circumstances of discrimination so intolerable that a reasonable person would resign,'" and the plaintiff-employee resigns as a result. *Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 235 (4th Cir. 2022).

85. By imposing numerous obstacles to Plaintiff's performance of his job duties and potential for advancement on account of Plaintiff's race and sex, Defendant constructively discharged Plaintiff in violation of Title VII.

86. Through their DE&I efforts, statements in their 10-K and the action of hiring objectively less qualified people to fill positions above Mr. Smith, based on their race and sex, the Defendant demonstrated that there was no path for advancement for Mr. Smith at their company.

87. As a result of Defendant Ally's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, loss of professional and career development opportunities, and significant non-economic injuries, including humiliation, embarrassment, and loss of reputation.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Smith respectfully requests that this Court enter judgment in his favor and against Ally with respect to each separate Count, and provide the following relief:

A. An order for such equitable relief, including back pay, as will make Christopher Smith whole for the Defendant's conduct; compensatory damages; punitive damages; and prejudgment and post-judgment interest.

B. Awarding compensatory damages to Mr. Smith for past pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which he has suffered as a result of Defendant's improper conduct.

C. An award of punitive damages.

D. An award of other such damages as appropriate for violations of Title VII and 42 U.S.C. §1981.

E. An order for damages under 42 U.S.C. §1986.

F. Declaratory Judgment that Ally's self-proclaimed DE&I policies violate the Civil Rights Act of 1866 and the Civil Rights Act of 1964.

G. Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

H. Such other relief as the Court deems just, proper, or equitable, including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

## JURY DEMAND

The plaintiff herein demands trial by jury on all Counts so triable.

Dated: June 4, 2023　　　　　　　　　　　　　　Respectfully submitted,

Andrew J. Block*
Nicholas R. Barry*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave, SE #231
Washington, DC 20003

/s/ Gilbert Dickey
Gilbert C. Dickey (NCSB 58350)
Thomas S. Vaseliou*
Seanhenry VanDyke*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209

Telephone: (202) 836-7958  
Email: andrew.block@aflegal.org  
nicholas.barry@aflegal.org

*Attorneys for Plaintiff*

(703) 243-9423  
gilbert@consovoymccarthy.com  
tvaseliou@consovoymccarthy.com  
seanhenry@consovoymccarthy.com  
*Attorneys for Plaintiff*

<u>*Pro Hac Vice Applications Forthcoming</u>